TRINITARIAN CONGREGATIONAL SOCIETY IN FRANCESTOWN *v*. UNION CONGREGATIONAL SOCIETY IN FRANCESTOWN.

Section 17, *c*. 154, Gen. Laws, does not authorize a religious society owning pews in a meeting-house to maintain a bill in equity against a religious society owning the house, for a sale of the house and a division of the proceeds of sale.

A religious society owning a meeting-house may decide, without interference from the pew-owners, what doctrines shall be preached in their house, and what religious teachers shall be employed to preach them.

BILL IN EQUITY. The substance of the bill is,—In 1773 a Congregational church was organized in Francestown, which has continued to exist and support religious worship and preaching in that town to the present time. In 1801 certain members of the church and others interested in the same kind of religious worship built a meeting-house in the town, upon land deeded to the town in 1772, "for the use and benefit of the inhabitants of said town; and to build a meeting-house, for a burying-yard and training-field." The house, was nearly or quite paid for by the sale of pews to individuals, and was used by the church as a place of public worship, and by the town for holding town-meetings, until it was rebuilt in 1837, as hereinafter stated. In 1825 the Union Congregational Society was organized from members of the church and others

interested, for the purpose of coöperating with and assisting the church in the support of Trinitarian Congregational religious worship. In 1833, the town, in consideration of $100, sold and conveyed by deed to the society "the right of said town to the meeting-house in said town, and the land on which it stands, with the bell, stoves, funnel, and other property in and belonging to the same, and the privileges upon the common and around the house and sheds as hitherto enjoyed by the society and individual inhabitants worshipping in said house, reserving to persons who have purchased pews in said house their full right to the same, and reserving to said town a right to use the house for town-meetings, and the bell for town purposes, as heretofore used, on condition that the town shall keep the outside of the house and the tower and bell, with its tackle, in good and complete repair."

In 1837, by agreement of the pew-owners and others interested, the meeting-house was rebuilt at an expense of $10,011.22, in which sum was included the value of the pews in the old house, as appraised, to wit, $5,059.40. The pews in the new house were appraised at $9,447.00, and there was bid at auction for choice of pews, $4,917.86: total, $14,364.86. The surplus ($4,353.66) was paid to the purchasers of pews by a discount of thirty per cent. on the price of their pews.

The church has, since its organization, held the creed and religious beliefs common to the sect of Christians known as Trinitarian Congregationalists; and with the coöperation and assistance of the society, after its organization and until 1875, it has held religious worship in the meeting-house, and supported preaching therein of the kind supported by that denomination. When the society took the deed in 1833, and when the pews were bought in 1837, it was the common understanding of the pew-owners in the meeting-house, and of the members of the society, that the meeting-house would be used as it had previously been.

In 1874, Rev. Henry F. Campbell, by the votes of the church and society, was engaged to preach in the house for one year as a Trinitarian Congregational minister. He accepted the creed of the church, and was ordained in accordance with the usage of the Trinitarian Congregational denomination. At the end of the first year the church voted to dismiss him on account of his disbelief in the doctrines he had been engaged to preach, and on account of his preaching doctrines directly opposed to them, and requested the society to join in dismissing him. A majority of the society were in favor of dismissal, but prior to the meeting called for that purpose, about sixty persons were secretly induced to join the society by signing the by-laws, and by means of the votes of the new members a vote to dismiss him failed to pass. In November, 1875, Mr. Campbell united with the church in calling a mutual council, and agreed to abide the result. The council voted unanimously to dismiss him, fixing the termination of his pastorate

April 1, 1876. Prior to and at the annual meeting of the society, held in March, 1876, about forty respectable citizens of the town, most of whom were pew-owners in the house, or had formerly belonged to the society, attempted to join the society by signing its by-laws; but prior to the meeting they were prevented by the excuse of the clerk that he did not have the book, and his promise that he would have it at the meeting, when all could join who wished; and at the meeting they were prevented by the resignation of the clerk, and by his failure to have the book at the meeting, as he had agreed, and as had been the custom, and by the interference of a constable, at the direction of the moderator, when they attempted to join the society by subscribing to the by-laws contained in another book at the meeting. The society, at the meeting, after having prevented them from becoming members by force and fraud, as aforesaid, passed a by-law requiring a two-thirds vote of the society to admit new members. If they had not been prevented from joining the society, a majority would have voted against retaining Mr. Campbell to preach, and the society would have been controlled, as it always had been prior to 1875, by persons desiring Trinitarian Congregational worship in the meeting-house. The defendant society, since the annual meeting in 1876, have employed Mr. Campbell to preach in the meeting-house, have assumed the exclusive control over it, and have denied the church and the pew-owners the right to use it any part of the time.

In 1880 the pew-owners in the meeting-house who desired Trinitarian Congregational worship in the house, organized the Trinitarian Congregational Society as a religious society, in accordance with laws of the state, for the purpose of assisting and coöperating with the church in the support of religious worship, and of securing to the pew-owners their rights in the meeting-house.

The plaintiff society owns 49⅓ pews, costing $4,247.60; members of the plaintiff society own 38⅓ pews, costing $3,576.34; the defendant society owns 2 pews, costing $221.20; members of the defendant society own 17¾ pews, costing $528.40; all others own 5¾ pews, costing $445.25;—total (including the pastor's pew), 114 pews, costing $10,018.79. (Here follows a list of all persons known to be interested in the house.) The prayer is for an appraisal and sale of the meeting-house, and for general relief. There is also a prayer for a receiver to take the charge and custody of the meeting-house during the pendency of this proceeding, with directions to allow the plaintiff society the use of it an equitable share of the time.

The defendants demurred. 1. Because the plaintiffs have no standing in court, inasmuch as *c.* 153, Gen. Laws, does not authorize the formation of a religious society and the holding of real and personal estate for such purposes as are disclosed in the bill. 2. The law does not authorize the appraisal and sale of the defendants' property on the facts set forth in the bill. 3. The plaintiffs,

if they have any standing in court, cannot complain of acts which occurred before the alleged date of their corporate existence. 4. The differences in religious opinions set forth in the bill are not ground for any action on the part of the court.

*L. D. Stevens* and *Leach & Stevens,* for the plaintiffs.   1. If a religious society can protect the church property of its members, it is lawful to organize a society for that as one of its objects.   Any religious society may own pews in a meeting-house.   There is no allegation that the plaintiff society holds its pews for any different purpose than is allowed by Gen. Laws, *c.* 153, *s.* 2.

2. The law authorizes an appraisal and sale.   All requisite facts are stated.   Gen. Laws, *c.* 154, *s.* 17.   The equity power of the court is ample, aside from the statute upon the facts alleged.   A separation of the interests of these two societies will alone end controversies.   Other relief may be given.   The defendant society holds its title in trust for the pew-owners.   The house was built and paid for by the pew-owners.   The plaintiff society and its members could sell it if it ceased to be used, or was insufficient to accommodate those desiring to worship, or could sell all the pews, or make any alterations in the interior, they owning three fourths of the pews.   G. L., *c.* 154, *ss.* 4, 12, 16.   If each pew-owner has the exclusive right to use his pew, why do not all the pew-owners of the house, or three fourths, have the right to say who shall use all the pews, and control the use of the church?   If the pew-owners have these rights, we claim the defendant society holds only a naked trust; and the trust should be revoked on the facts stated, and a new trustee appointed.   If no other relief can be given, a party owning a sufficient interest to control the interior alterations of the house, and, in certain contingencies, to sell the whole building, and having a legal right to occupy exclusively three fourths of the house, should be allowed the use an equitable share of the time.

3. The bill is brought in the interest of all pew-owners desiring Trinitarian Congregational worship.   If a sale is ordered under the statute, the main facts stated in the bill are not material except to show the title or interest of all parties interested.

4. Differences of religious opinion are not complained of, except so far as they injure property rights.   The plaintiff society complains that its property and that of its members, costing over $7,800, is rendered practically useless by being used by the defendant society without right, and for a different purpose from what everybody understood it was built for and was used for for seventy years; and whatever right the defendant society as now constituted has, was secured by force, fraud, and trickery.

We ask to be allowed some use of this property during the pendency of this proceeding, and that a receiver be appointed, with instructions to allow the plaintiff the right to use the house an equitable share of the time.

*Norris & Rand,* for the defendants, cited Gen. Laws, *c.* 153, *s.* 2; *c.* 154, *s.* 17; Laws 1871, *c.* 10, *s.* 1; Gen. Sts., *c.* 140, *s.* 4; *Richardson* v. *Society,* 58 N. H. 187.

*Leach & Stevens,* for the plaintiffs, on motion for a rehearing, took the following positions:

1. Pews at common law were real estate, and were in this state till 1812. The statute of 1812 was never intended to change the rights of pew-owners. The defendants' deed in 1833 reserved to the pew-owners their full rights, and they have never released their interest in the real estate.

2. The pew-owners wholly paid for the house, not for the purpose of conferring any benefit upon the society, but that they might have a house wherein they could exercise their constitutional right to worship as they chose. They took for their money a conveyance of a particular part for their own use, and divided *pro rata* among themselves the balance of the amount they had agreed to pay above the cost.

3. The pew-owners are entitled to the exclusive use of the pews. The conveyance was without condition. They took all the interest that could be conveyed in such property. *O'Hear* v. *De Goesbriand,* 33 Vt. 606; *Howe* v. *Stevens,* 47 Vt. 262; *Jackson* v. *Rounseville,* 5 Met. 127; *Gay* v. *Baker,* 17 Mass. 438; *Wentworth* v. *Parish,* 3 Pick. 346; *Jones* v. *Towne,* 58 N. H. 464. The owners of pews take by such a conveyance all rights necessary for the reasonable and proper enjoyment of their property. *Revere* v. *Gannett,* 1 Pick. 170; *Kimball* v. *Parish,* 24 Pick. 349.

4. Among the rights of pew-owners, necessary for the reasonable enjoyment of their property, is the right to have the house used for the purpose for which it was understood by all parties it was erected, or to have their property returned to them. The difference in the doctrine preached is an essential one; and these pew-owners are as much injured as if the society had put the house to other uses than that of public worship. Their pecuniary loss is greater, for with such an occupancy they might derive some income from their property, which they cannot now do.

5. Pew-owners cannot be deprived of their property without compensation. *Jones* v. *Towne, supra.*

6. The defendants can have no greater rights than are conferred upon them by statute or by the constitution.

Have they the right, under the constitution, to say who shall preach in this house? The strongest argument we have been able to find in favor of a society's right to control the preaching in a house like this is the dissenting opinion in *Hale* v. *Everett,* 53 N. H. 227. The right is based upon the constitutional right of a parish to elect their own teachers. We think an application of the reasoning in that opinion, as well as in that of the majority of the court, is decidedly in our favor. We must recognize the fact

that here are two religious societies, both claiming under this same right. Let us suppose the pew-owners, united as individuals, desire one kind of worship, and the defendant society as a distinct body, owning no pews, desire another kind. If the defendant society has the right to prescribe for these pew-owners what kind of worship they shall have, it is a plain case of one body having the right to control the worship of another. The individual has the same right as a society to elect his own teacher. The place for a parish to exercise its right of electing its own teachers is in a house built by a tax upon its members, according to the method provided by statute, and not in a house which individuals have built and paid for, and in which they are entitled to the exclusive use of all that is beneficial for public worship.

This question has seldom arisen, because a majority of pew-owners usually control the society, and members of religious societies are usually governed by a sense of justice, if by no higher principle; and when a portion have wished to start a new sect, they have thought it more honorable to build a meeting-house, or compensate aggrieved pew-owners, than to capture the house of another denomination by changing the majority to the minority by force and fraud.

7. The court, in the opinion delivered in this case, suggest this doctrine of pew-owners' having the right to control as dangerous, because members of other societies might buy up pews and turn the congregation out. Our answer is,—(1) The same danger exists in a minority of a society getting control by trickery, as in this case, without paying anything. It being a part of the work of religious societies to convert the heathen, they almost always keep open doors, and make the terms of membership as light as possible. (2) The society may prevent such danger by a sale of pews on condition, as in *Hale* v. *Everett*. (3) There is less danger of a minority getting control by purchase of pews, because those who desire to continue existing worship will not be likely to sell their pews. (4) The method is better which obliges a minority to pay for a house in order to control it. (5) In *Attorney-General* v. *Proprietors*, 3 Gray 48, the court substantially admit this danger. "It is usual for such societies to make regulations in regard to the sale of pews, and express them in their deeds; otherwise a number of people of another denomination might purchase pews and become a majority, and thus turn the proper congregation out of their own house." What do the court mean here by "becoming a majority," if they do not recognize the law as we claim it?

The society, then, must hold the title in trust for the pew-owners. If the court say the trust is for the members of the society, then we represent the minority, and claim relief under the authority of *Hale* v. *Everett*.

Unless the defendants' interest is held in trust, it may be

attached by any individual creditor; and he may devote it to any other use than public worship, as suggested, or may sell to some religious society of another sect.

If the defendant society has the right to determine the kind of worship, it is a clear case of one body having the right to elect teachers for another. The rights of the parties, as before suggested, seem to show clearly a trust. The safest and most equitable doctrine would seem to be, that a house built and paid for by individuals of a certain sect for the exercise of their constitutional right to worship, and in which they are entitled to the exclusive use, cannot be diverted by another body to worship of an essentially different character without at least returning to the founders the value of their property. By this rule, all rights of property will be preserved, and religious societies can keep open doors without danger of their property being taken from them by those who have no interest in it.

If the court hold that a majority of a religious society can change the worship in a meeting-house to that of an essentially different character, we claim relief upon the ground that the majority of this society have been deprived of their rights by the minority by force, fraud, and trickery.

The bill alleges that at the time the meeting was called for the purpose of dismissal, a majority were in favor; but prior to the meeting about sixty persons were secretly induced to join, and by means of the votes of the new members a vote to dismiss failed to pass. The bill further shows there are only twenty members of the defendant society who have any pecuniary interest in the house, so there must have been at least forty men, women, and children who were secretly induced to join the society, who had no pecuniary interest whatever in this house, and no right to sit in it to be taught except by the courtesy of others.

When the majority of the pew-owners saw that these forty persons, who had no legal right to sit in this house, had elected a person to teach therein doctrines antagonistic to those taught there for seventy years, they called upon the clerk for the purpose of joining the society, and were denied the right upon the excuse that he had not the book, but would have it at the next annual meeting, where all could join who wished; and at the annual meeting they were denied the right by the resignation of the clerk, his failure to have the book at the meeting as he had promised, and by a constable at the direction of the moderator when they attempted to sign the necessary by-laws in another book. By these means forty persons were injected into the society who had no interest in this house, and forty were kept out who certainly had an equal right to join, and most of them, as the bill alleges, were owners of pews. Is not this a clear case of the subversion of the rights of the majority by the minority? Is this no infringement of the right given these pew-owners to elect their own teachers, and to worship God accord-

ing to the dictates of their own consciences? Are these constitutional rights held by such a slender tenure, that, after men have built a place to exercise them, the minority of a society can subvert the majority, and take them away by such methods? If a majority of a religious society of any sect are entitled to control its property, can another religious sect secretly join in such numbers as to become the majority, and turn the rightful majority out of its property? Religious societies of different sects stand in the same relation to each other as adjoining towns did under the parochial system. The foundation of the right of a religious society to elect its own teacher rests upon the parochial system. By that system every legal voter in the town had the right to vote in parish meetings. The right of the majority to control was based upon the right of every pew-owner, if a legal voter in the town, to vote.

The defendant society took its title subject to this right, and every pew-owner had the constitutional right to join this society and vote upon any question affecting his property rights. The minority of this society having secured a majority by such means, and thereby defrauded the rightful majority of their rights, all their acts should be declared void, the membership of the society should be restored to what it was before this trick was perpetrated, and all persons who have a pecuniary interest in this house should be allowed to join and say how the property should be used. The fact that some of the plaintiff members left the defendant society to avoid taxation and further injury should not affect their rights. Having been compelled to do it to escape further injury from the defendants' wrongful acts, the defendants should not be allowed to take advantage of their own wrong; they should still be considered as members. The law does not consider that as done which is compelled by duress. It is almost essential to the life of many societies that they gather all the strength they can from liberal terms of membership. It is more healthful for the state that new religious societies should build meeting-houses than to steal them.

*E. D. Rand,* for the defendants, orally in reply. What interest has the plaintiff society? All these irregularities occurred before it was born. It is *nullius filius.* It inherits from no ancestry. Can A bring an action for assault and battery on a stranger, not even his father, before he was born? This is a battle in the clouds. The bill does not allege that the defendants have wronged anybody, or that the plaintiff society has been wronged. The bill alleges that sixty persons were secretly induced to join the society. It does not allege that the defendant society or any member induced them. What is the wrong of secretly inducing a person to join a religious society? Suppose I induce one to join my society by making him believe it is the only door to the kingdom of heaven: he makes no complaint. Why should a third person complain?

It does not appear that the excuse of the clerk, that he did not have the record-book, is not true.

*Richardson* v. *Society*, 58 N. H. 189, is in point. The plaintiff society was organized for the purpose of this suit,—to assert litigious rights. It owns forty-nine pews. What did they buy them for if they do not enjoy our preaching?

The change from Trinitarian to Unitarian worship is a change the courts cannot remedy. *The Dublin Case*, 38 N. H. 459. Men will not think alike any more than look alike. When we choose a Christian for teacher, can any one interfere? The constitution provides that religious societies shall have at all times the exclusive right to elect their teachers. The next question is, Can a religious society put its own teacher in its own house? The plaintiffs' pew-owners do not own their pews in any different way from other pew-owners. They have two remedies. They can occupy their pews, or sell them. They have no other remedy.

SMITH, J. The plaintiffs pray for an appraisal and sale of the meeting-house, and for general relief, agreeably to the provisions of Gen. Laws, *c.* 154, *s.* 17, which is a reënactment of *s.* 2, *c.* 10, Laws 1871. The statute provides that when any meeting-house or other real estate is owned by two or more religious societies, or when two or more societies own pews in a meeting-house, and either society is desirous of terminating the joint ownership or ownership in common, it may apply to the supreme court for an appraisal and sale thereof, and the court may direct a sale, and distribute the proceeds to the parties interested. The fee of the house and land is in the defendants. The plaintiffs are not tenants in common or joint tenants with the defendants in the house, and have no interest in the house except as pew-owners of forty-nine and one sixth pews. The defendants own two pews. The right of a pew-owner is the right to the use of the pew during divine service. His right is subject to the right of the owners of the house to take down, rebuild, or remove the house for the purpose of more convenient worship. *Fisher* v. *Glover*, 4 N. H. 180; *Jones* v. *Towne*, 58 N. H. 463. If the court has authority under this statute to order a sale, it can only be of the plaintiffs' and defendants' pews, for the plaintiffs do not own the house, nor are they tenants in common of the house or of the land on which it stands. The plaintiffs do not need a decree to enable them to sell their pews; and the statute does not authorize a sale of the house and a division of the proceeds between the defendants who are and the plaintiffs who are not owners of the house, for the purpose of depriving the defendants of the legal control of their property on account of a difference of theological opinion, and the sectarian use which the independent society makes of its own pulpit. That use is one of the rights of the incorporated owner of the house and pulpit, subject to which the title of the pews is held.

But the plaintiffs claim that aside from the statute the court can grant relief under the equity powers which it possesses, and they claim that they make a case for the interposition of this power. Their position is, that the plaintiff society and its members, owning eighty-seven and a half pews out of a total of one hundred and fourteen, of the value of $7,823.94 in a total valuation of $10,018.79, are excluded from any beneficial use of their property by the action of the defendant society in supplying preaching opposed to the doctrines upheld by the plaintiffs, and therefore ask that the house may be sold and its proceeds divided among the pew-owners. Religious societies are voluntary corporations, formed for the purpose of maintaining public religious worship, and are recognized by our Bill of Rights (art. 6) and protected by our laws. The members of the corporation are those who associate together for that purpose by written articles signed by each member. G. L., *c.* 153, *s.* 1. The pew-owners, as such, do not constitute the corporation, and have no voice or vote in the management of its affairs. The statute (G. L., *c.* 153) is,—"Sec. 2. Such society shall possess the powers and be subject to the duties incident to corporations of a similar nature, so far as the same are not limited or enlarged by this chapter; may take and hold real and personal estate for the purpose of erecting and keeping in repair a house of public worship, a parsonage house, and other buildings necessarily connected therewith, and supporting the ministry in such society; and may improve and dispose of the same for the sole use and benefit of such society; but the annual value or income of all the property of such society shall not exceed $5,000.

" Sec. 3. No person shall be liable as a member of any society, without his express consent first had and obtained; and any person may separate from any society, by leaving with the clerk thereof a written notice by him signed of his intention so to separate, and paying all legal assessments and arrearages then due from him to such society.

"Sec. 4. Such society may assess and raise money by taxes upon the polls and ratable estates of the members thereof, and collect and appropriate the same for the purposes aforesaid; and the assessors and collectors, in assessing and collecting any such tax, shall have the powers and be subject to the penalties of similar town officers in like cases."

It is the society that is authorized to hold property for the purpose of erecting a house of worship and parsonage, and for supporting the ministry. Members of the society only are subject to assessment, and to them alone is entrusted the management of its affairs. No pew-owner can become a member against his consent; and if a member, he does not lose his property in his pew by separating from the society.

Various statutes have been passed from time to time which have been consolidated into *c.* 154, Gen. Laws, having for their object

the sale, repair, and modification of meeting-houses. Thus: In 1848 a statute authorizing the sale of meeting-houses unoccupied for two years: in 1865 a statute authorizing the sale of a meeting-house built by the pew-holders which has ceased to be occupied. But none of the provisions of that chapter are applicable to this case. "It merely recognizes the superior rights of the society as they existed at our common law, and provides a mode of compensation to the pew-owner for the loss or destruction of his pew in certain cases." *Jones* v. *Towne, supra,* 465.

The bill alleges that this house was built in 1801 by certain members of the church upon land of the town "for the use and benefit of the inhabitants of the town," and was nearly or quite paid for by the sale of pews. Until it was rebuilt it was used by the church as a place of public worship, and by the town for holding town-meetings. In 1833 the town conveyed the house to the defendant society, reserving the right to use it for town purposes, and to the pew-owners their right to their pews. When the house was rebuilt in 1837, it was done by agreement with the pew-owners, the expense of rebuilding and the value of the pews in the old house being paid by a sale of the new pews. It thus appears from the bill that neither the title nor ownership of the house was in the church as a corporation, nor in the pew-holders, but·prior to 1833 in the town, and since in the defendant society. *The Dublin Case,* 38 N. H. 459, 576; *Hale* v. *Everett,* 53 N. H. 9, 83, 143–145.

It is doubtless competent for persons to form a religious corporation, and agree among themselves that none except pew-owners shall be members of the corporation, and when a pew-owner sells his pew that he shall cease to be a member. Doubtless they might go farther, and stipulate that the sale of pews be restricted to such persons as the corporation will vote to receive, and this for the purpose of preventing persons of other ·denominations from obtruding their presence and stirring up dissension. There are such religious societies in Massachusetts, existing under special charters. *French* v. *Old South Society in Boston,* 106 Mass. 479, 487. But there are no stipulations of that character in this case, and no restrictions upon the sale of the pews.

As there is no law requiring a church to be connected with a religious society, it may exist without such connection. *Holt* v. *Downs,* 58 N. H. 170. Such a society is as independent as a church. Its relations are such as it chooses. It may choose none. Whether a church and parish shall carry on all or any part of their work separately, or jointly, is a question for them to decide. The law does not require them to make any stipulation on the subject. *Holt* v. *Downs, supra,* 172. It is immaterial, then, what have once been the relations existing between the defendant society and the church formerly associated with it. The church as a church never had any ownership in the house. If members of the church have been or are now members of that society, it is not ·

because they were or are members of the church, but because they entered into a compact with the other members of the society to become such. The defendant society owning the house may carry on its work of furnishing such religious instruction as it alone, or jointly with such church as it may ally itself with, may choose to support. See *Wood* v. *Cushing*, 6 Met. 448, 456. We are not aware of any case where it has been held that the pew-owners can decide what doctrine shall be preached except where the society is composed of pew-owners only. Any other rule would expose every religious denomination to the risk of having its pews bought up by persons of hostile religious views, and, by becoming a minority, of being turned out of its own house. *Attorney Gen.* v. *Prop. of M. H. &c. of Boston*, 3 Gray 1, 48. A compulsory sale of the defendants' property, and a transfer of a part of the proceeds to the plaintiffs, would be an inappropriate remedy for anything of which the plaintiffs complain.

*Demurrer sustained.*

STANLEY, J., did not sit: the others concurred.